**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 09-4802**

—————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PERRY ROGER SHIPPY,

Defendant - Appellant.

—————

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Lacy H. Thornburg, District Judge.  (1:09-cr-00023-LHT-DLH-10)

—————

Argued: March 21, 2012          Decided: April 24, 2012

—————

Before WILKINSON and DAVIS, Circuit Judges, and HAMILTON, Senior Circuit Judge.

—————

Affirmed by unpublished opinion. Judge Davis wrote the opinion, in which Judge Wilkinson and Senior Judge Hamilton joined.

—————

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Charles Wyatt McKeller, Brevard, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

—————

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

Appellant Perry Roger Shippy was convicted on indictment counts charging conspiracy with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and use of a communication facility in connection with that offense, in violation of 21 U.S.C. § 843(b). On appeal, Shippy argues that the district court erred in denying his motion for judgment of acquittal as to both offenses, and in imposing a mandatory minimum ten-year sentence based on a drug quantity that was not specifically found by the jury.[1] Having fully considered Shippy's contentions, we affirm.

## I.

## A.

In 2008 and 2009, Shippy came to the attention of law enforcement as a result of an ongoing investigation into the drug trafficking activities of his "distant cousin" and co-defendant, Kenneth Lee Foster.[2] In September 2008, Drug

---

[1] Shippy also contends that he should have been sentenced under the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372. Shippy concedes, however, that he makes this argument only to preserve it, as it is foreclosed by our decision in United States v. Bullard, 645 F.3d 237 (4th Cir. 2011), cert. denied, 132 S. Ct. 356 (2011), by which this panel is bound. United States v. Rivers, 595 F.3d 558, 564 n.3 (4th Cir. 2010). Accordingly, we do not further address this issue.

[2] We affirmed Foster's conviction in United States v. Fountain, 416 F. App'x 304 (4th Cir. 2011) (unpublished).

Enforcement Agency (DEA) agents and local Asheville police targeted Foster for surveillance after Bridget Lee was charged with drug trafficking and identified him as one of her sources. The agents initially confirmed Lee's information by having her make monitored calls to Foster's cell phone. Persuaded that her identification of Foster was accurate, the agents then had Lee undertake two controlled buys of crack cocaine from him, on September 9 and September 11. The buys were monitored by audio and (unbeknownst to Lee) video surveillance, and resulted in Lee's purchase of about 91 grams of crack on each occasion.

With this and other evidence of Foster's drug trafficking, agents obtained a warrant authorizing a wiretap to intercept communications to and from Foster's cell phones. In addition to monitoring Foster's calls, agents installed a video surveillance camera up the street from Foster's residence where he carried on his drug trafficking activities. The position of the camera was such that agents could observe only the area in front of the main building entryway; the door to Foster's unit, or that of any other resident of the building, was not in view.

Agents observed Foster's building and monitored his phone calls for approximately four months total, from October 24, 2008, through February 24, 2009. During this time, they observed a pattern of behavior by visitors to Foster's home: a phone call to Foster before an arrival, often a second phone call when the

3

visitor was a few minutes away or had arrived at the residence, and finally a brief, five to ten minute interaction with Foster either in the apartment or from the visitor's vehicle parked outside the building. As agents observed this conduct, they endeavored to identify the visitors, i.e., Foster's suspected customers, by running DMV registration records for their cars. Agents also endeavored to corroborate their belief that Foster's visitors were purchasing crack cocaine from him by undertaking traffic stops after the visitors left his residence. Three such stops effected for this purpose in fact yielded significant seizures of crack cocaine.

On December 8, 2008, agents first observed the man later identified as Shippy.[3] At 2:52 p.m., Foster made an outgoing call to phone number (828) 398-. Foster referred to Shippy as "Pete," and stated that he "got a hold of a little something." Shippy asked, "What are we talking about . . . on a Q."[4] Supp. J.A. 1. Foster answered, "Five for you but five on the thing but you

---

[3] Shippy testified in his own defense and generally denied that it was he who was observed on December 8 (or that he was involved in the drug trafficking conspiracy at all) but of course the jury was entitled to discredit that testimony, as indeed it did.

[4] DEA Agent Daniel Guzzo, a member of the coordinated team investigating Foster, testified that a "Q" indicated a quarter ounce (approximately 7 grams) of crack cocaine.

4

know a tray [sic] on the Q for you five on the half so . . . ."[5] Id. Foster then noted, as phonetically translated by the monitoring agents, "It post to be [pretty] nice they say but it ain't much I just going to be honest." Id. Shippy responded, "let me call you back in a just a few minutes so I can get some funds together." Id. at 2.

About an hour later, at 3:49 p.m., Shippy called Foster from the same phone used in the above conversation, saying he was heading to the residence and would see Foster in ten minutes. At 4:01 p.m., 12 minutes later, a Nissan Altima arrived at Foster's building and Shippy exited. Agents ran the plates of the Altima and discovered that it was registered to Jessica Goodien, at an address in a nearby town. Later investigation revealed that Goodien was Shippy's live-in girlfriend. Shippy left Foster's apartment at 4:32 p.m. Foster later called to "verify the quality of the crack cocaine." J.A. 350.

Several weeks later, agents eventually confirmed (to their satisfaction) that it was indeed Shippy they had observed on December 8 when they observed a car arriving at Foster's

---

[5] From the testimony of DEA agents and Bridget Lee (who described herself as "not a virgin to crack cocaine," J.A. 180), the jury was entitled to find that Foster was offering to sell a quarter ounce of crack ("a Q") for $300 ("a tray"), or a half ounce ("a half"; approximately 14 grams) for $500 ("five"). This would roughly track the unit cost of crack from the controlled buys and other transactions discussed in the record.

residence after phone calls from the same number that had communicated with Foster on December 8. That car, a late model Mercedes, was registered to Shippy himself. Having determined that Shippy was the person associated with the number, that phone line was ascribed by agents to Shippy for the remainder of the investigation.[6]

On December 27, agents monitored and recorded another series of calls between Foster and Shippy. During the first call, at 3:41 p.m., Shippy stated to Foster, "You said you was going to get half the whole thing." J.A. 804. Foster replied, "Uh hun[.] Yea you got to check that chicken out too man it cooks pretty good." Id. Trial testimony explained that "chicken" was code for cocaine. Id. at 254. Foster also instructed Shippy, "Stay by your phone I am going to hit you back." Id. at 804. A few minutes later, at 4:03 p.m., Shippy called Foster back, "checking with ya to see if I could get any kind of help." Foster replied that they should "meet in the home front." Id. at 805.

Video surveillance of Foster's building showed that at 4:34 p.m., the Mercedes registered to Shippy arrived at the

---

[6] Agent Guzzo testified at trial that while investigators sometimes identified Foster's contacts by researching the registered user of particular phone numbers, the number ascribed to Shippy was never researched because correlation of phone calls and visits by Shippy adequately established his identity.

residence. While the record does not indicate how long Shippy's car was present, phone records indicate that at 8:08 p.m., Foster called Shippy's phone, asking, "How did you like those shoes[?]" Id. at 806. Shippy replied, "I ain't slowed down since I left you[. I]t is all well." Id.

Two days later, on December 29, 2008, agents again monitored calls between Foster and Shippy. At 5:23 p.m., Shippy told Foster that he was "2 minutes away." Id. at 807. Video surveillance indicates that at 5:38 p.m., Shippy arrived in his girlfriend's Altima, entered Foster's building, and departed soon after. On December 31, Shippy called Foster at 11:58 a.m. Foster told Shippy, "I'm getting you ready now . . . it's going to take a minute . . . . But I'm doing it now." Id. at 808. Shippy answered, "I'll just hover over here for a minute then," and Foster ended with, "Ok I'll just give you a yell." Id. At 12:46 p.m., Foster called Shippy, asking, "where you at?" Id. at 809. Shippy answered that he was right around the corner and Foster said, "Alright come on up man." Id. Surveillance images showed Shippy arrive in the Altima ten minutes later, at 12:56 p.m.

Days later, on January 3, 2009, Shippy and Foster apparently talked again, with Foster saying, "I want you to eat," and Shippy replying, "That's what I wanted to do is eat." Id. at 375. About ten minutes later, at approximately 12:29

p.m., Foster called Shippy, asking, "where you at?" Id. at 810. Shippy replied, "Right down the street, I'll be there in a second." Id. A minute or two later, Shippy was observed exiting the Altima and walking towards Foster's building. On January 8, Shippy was observed outside Foster's building, in his Mercedes.

Shippy's communications with Foster were recorded, and his presence at the residence was captured on camera soon after those conversations, on five more days in January. Of particular note, on January 25 at around 4:00 p.m., Shippy called Foster after a couple of earlier conversations arranging his visit. At the start of this conversation, the following exchange occurred:

Foster: Yo

Shippy: Yeah, I just wanted old boy to know how strict the thing was between me and you

Foster: Oh I felt it, I felt it

Shippy: Oh you know those customers they will wait till the last minute when they get to your door and everything's backwards

Foster: Yeah yeah why you think I went that route though?

Shippy: Yeah

Foster: When you said no, I'm down, and I said yeah ok I got ya

Shippy: Yeah

Foster: I appreciate that hey man do me a favor and go ahead and get that out there right quick to somebody and give me a test run back on that as soon ASAP.

8

> Shippy: Ok but I believe it's gonna be alright but
> I'll go do that now

Id. at 818. Two days later, on January 27, Shippy stated to Foster during a phone call at 12:18 p.m., "I just wanted to remind you about the 14 I'm out here."[7] Id. at 820. A surveillance image was taken of Shippy outside Foster's building simultaneously at 12:18 p.m. Shippy departed just minutes later, at approximately 12:20 or 12:21 p.m. This was the last interaction between Foster and Shippy presented to the jury.

### B.

As a result of the investigation detailed above, on April 7, 2009, Shippy was indicted in the District Court for the Western District of North Carolina on two counts: (1) conspiracy to possess with intent to distribute fifty or more grams of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and (2) use of a communication facility in causing and facilitating that conspiracy, in violation of 21 U.S.C. § 843(b). A few months prior, Foster and 14 others had been indicted on the same two charges for conduct during the same period of time.

---

[7] Bridget Lee testified that when she said "four and a half" during her conversations with Foster, she was referring to four and a half ounces of crack cocaine. J.A. 111. Thus, the jury was entitled to infer, as the Government urged, that "14" refers to 14 grams, or one half ounce, of crack cocaine.

After his arrest, Shippy promptly filed a number of pro se motions including "motions to compel, to appeal the 'bond hearing,' for dismissal, and to suppress," despite the fact that he was represented by counsel. Id. at 16. The motions were all "summarily denied" on the ground that Shippy must communicate to the court through his attorney. Id. at 20. Notwithstanding the admonishment, Shippy again submitted a pro se motion on May 18, 2009, requesting a separate trial from the nine co-defendants listed on his indictment on the ground that he had "very little to no acquaintance, relations, or affiliation" with them. Id. at 22. Again the motion was summarily denied.

The next month, the Government moved for a joint trial of Shippy and the remaining defendants in the earlier Foster indictment. Shippy's counsel did not object to a joint trial and the motion was granted. A joint trial then proceeded for Shippy, Foster, and Yvonne Marie Fountain, Foster's girlfriend. See supra n.2.

At trial, the vast majority of the evidence addressed the conduct of Foster and Fountain, whose conduct was inarguably the subject of greater and stronger direct evidence than that of Shippy. See, e.g., J.A. 322-25 (testimony that a half kilo of powder cocaine and cash were seized in Foster's apartment); 492-94 (testimony that crack cocaine and "around $21,000" in cash were seized in Fountain's home). In fact, as Shippy points out,

10

"Agent Daniel Guzzo was the only government witness to mention Mr. Shippy." Supp. Appellant's Br. 6. Guzzo testified that agents identified Shippy as the user of the (838) 398— phone number by correlating his arrival in the Altima registered to his girlfriend and his own Mercedes to calls made from that number. He further testified, as mentioned above, that conversations between Shippy and Foster included use of code words for the sale of crack cocaine.

Under questioning, Agent Guzzo conceded that video surveillance did not actually indicate which apartment Shippy entered during any of his visits to Foster's building, and the phone number ascribed to Shippy had not been researched as to its registered user nor did it match the cell phone seized from Shippy at the time of his arrest. Moreover, Shippy's home did not contain any drugs or large amounts of cash at the time it was searched, and no one involved in the investigation "was familiar with Mr. Shippy." J.A. 457.

Shippy elected to testify in his own defense. He averred that he was not the person whose voice was recorded from the (838) 398- number. In addition, he explained his presence at Foster's building as visits to see Foster socially and invite him to church events, and to see a Ms. Lytle, a first-floor resident of Foster's building, whose kitchen he hoped to renovate through his home maintenance business. Shippy claimed

11

that he was drug- and alcohol-free (after a prior period of substance abuse) and had never purchased drugs from Foster who "had never even come around me with such," knowing that Shippy was a recovering addict. Id. at 737. When asked on cross-examination whether his arrival at Foster's building only minutes after a caller from the (838) 398- number indicated he was right around the corner and would be coming by was "just coincidence," Shippy replied, "I don't know ma'am. I have no idea." Id. at 745.

During deliberations, the jury requested the date and time of audio recordings between Foster and the phone number ascribed to Shippy, and indicated they were attempting to correlate this information with the dates for the video images of his presence at Foster's building. After a total period of approximately four hours, the jury returned guilty verdicts for Shippy, Foster, and Fountain as to the conspiracy offense. Shippy and Foster were also found guilty of the use of a communication facility offense. On the verdict sheet, as to the conspiracy count, the jury made the following specific findings as to Shippy:

> As to the charge of conspiracy to possess, with the intent to distribute, cocaine [base] contained in Count One of the Bill of Indictment . . .
>
> Guilty
>
> 1. Do you unanimously find beyond a reasonable doubt that the Defendant . . . was personally involved with

12

the possession with intent to distribute of 50 grams [sic] or more of cocaine base?

No

2. Do you unanimously find beyond a reasonable doubt that the other members of the conspiracy were involved with the possession with intent to distribute cocaine base and that this involvement was either known to the Defendant or reasonably foreseeable to him and was in the furtherance of the conspiracy?

Yes.

Id. at 822-23. The final section of the verdict sheet directed the jury to indicate the amount of cocaine base attributable to each defendant, from among six choices: less than 50 grams; 50 - 149 grams; 150 - 499 grams; 500 grams – 1.49 kilos; 1.5 kilos – 4.49 kilos; or 4.5 kilos or more. As to Shippy, the jury indicated the lowest listed amount, "less than 50 grams cocaine base." Id. Thus, the jury essentially convicted Shippy of a lesser included offense as to count one, namely, conspiracy to distribute cocaine base in an amount less than fifty grams.

C.

In advance of sentencing, a probation officer prepared a pre-sentence report (PSR). In response to the draft PSR, Shippy made nine objections, including the following:

[The PSR] should be amended to read that the Defendant was responsible for at most one-half ounce of crack cocaine based on the evidence adduced at trial which equates to 14 grams or at least between 5 and 20 grams of cocaine base. The proposed amendment would support a change to the Guideline calculations to make the Base Offense Level 24.

13

<u>Id.</u> at 874. The final PSR included revisions to address these objections, ultimately concluding:

> [T]he jury determined the defendant is accountable for less than 50 grams of cocaine base. The investigation determined the defendant and Kenneth Foster had telephone conversations consisting of the defendant's desire to purchase unknown amounts of crack cocaine. As such, case agents place the defendant's responsibility in the range of at least 5 grams but less than 20 grams of crack cocaine.

<u>Id.</u> at 853. The Base Offense Level was therefore computed, in the absence of any applicable adjustments, at 24 for both counts. Review of Shippy's criminal history yielded 12 criminal history points for a criminal history category of V. These calculations resulted in a guideline term of imprisonment of 92-115 months.

The PSR further noted, however, that the statutes applicable at the time provided a mandatory minimum sentence of ten years imprisonment and eight years of supervised release for a defendant, like Shippy, who has a prior conviction for a felony drug offense.[8] For the communication facility offense, the PSR noted a maximum sentence of eight years.

---

[8] The Government had filed an information under 21 U.S.C. § 851 of its intent to seek the enhanced penalty in 21 U.S.C. § 841(b)(1)(B) against Shippy, based on his prior state conviction for a felony drug offense. As discussed in more detail below, the mandatory minimum applied to an offense involving 5 or more grams of cocaine at the time of Shippy's sentence. In 2010, the provision was revised and the ten year mandatory minimum (Continued)

14

At his sentencing hearing, Shippy raised only one additional substantive objection to the PSR, specifically that the imposition of an enhanced mandatory minimum sentence of ten years, under 21 U.S.C. § 841(b), reflected the 100-to-1 cocaine base/powder cocaine disparity and should be varied downward in light of that unfairness.[9] The Government replied, "[T]he fact is this is a statutory mandatory minimum. The Court couldn't vary from if it chose to. So the statutory – that's the law right now, so until it's changed otherwise, it's 120 months." Id. at 829.

The district court found that the statutory minimum was applicable, as asserted by the probation officer and the Government, and therefore sentenced Shippy to 120 months' imprisonment and eight years of supervised release for the conspiracy charge, and 96 months, to be served concurrently, for the communication facility charge. Id. at 833. Shippy has timely appealed.

---

currently applies to an offense involving 28 or more grams of crack cocaine. 21 U.S.C. § 841(b)(1)(B)(iii).

[9] In making this argument, Shippy's counsel at one point inaccurately stated, "[T]he jury determined that he had possession or responsibility for more than 5 grams of crack cocaine." J.A. 828. In fact, the jury's only finding regarding quantity was that less than 50 grams of crack cocaine were attributable to Shippy. Id. at 823.

15

Shippy first argues that the district court erred in denying his Rule 29 motion for judgment of acquittal for both charged offenses. Our review of the denial of a motion for judgment of acquittal is de novo, under longstanding principles, as we summarized in United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010) (internal quotation marks and citations omitted):

> We review the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction. "Substantial evidence" is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. Further, a reviewing court may not assess the credibility of witnesses, but rather must assume that the jury resolved all contradictions in testimony in favor of the Government.

To obtain a conviction for conspiracy to possess with the intent to distribute cocaine base, the Government must prove the following essential elements: (1) an agreement between two or more persons to possess with the intent to distribute cocaine base; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy. United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008). Once the Government proves the existence of a conspiracy, the evidence need only establish a "slight

connection" between the defendant and the conspiracy to support the conviction. Green, 599 F.3d at 367. Additionally, a defendant may be convicted of conspiracy without knowing all of its details and even if he plays only a minor role, as long as he enters the conspiracy understanding that it is unlawful and willfully joins in the plan at least once. Id. at 367-68; United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) (en banc).

## A.

Shippy argues that the Government failed to produce sufficient evidence of his participation in a conspiracy because, "[a]lthough a conspiratorial agreement need not be proved by direct evidence, there was not even substantial inferential or circumstantial evidence against Mr. Shippy." Supp. Appellant's Br. 11. Shippy emphasizes that he was unknown to any of the informant co-conspirators who testified at his trial, he did not have drugs or cash in his home at the time he was arrested, he was not shown to own or have used the phone number ascribed to him, and none of the conversations he allegedly had with Foster involved any quantity of cocaine in any event. Id. at 14. Shippy makes an alternative argument to the effect that at most, the evidence showed that he was merely a buyer of cocaine base for his own personal use and not a knowing member of a distribution conspiracy.

17

The Government responds by essentially arguing that Foster's conduct was robustly proven to comprise drug trafficking and that Shippy's calls and visits to Foster's home matched the pattern of Foster's known customers.

Under Burgos, a conspiracy may be adequately proven even where it has an "elusive quality," and the defendant has "little or no knowledge of the entire breadth of the criminal enterprise." 94 F.3d at 858. "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" Id. (citing United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984)).

We have no hesitation in concluding that the mosaic of evidence described above was sufficient to permit the jury to find beyond a reasonable doubt that Shippy was a knowing member of the Foster drug trafficking conspiracy. The phone calls attributed to Shippy unmistakably suggest drug trafficking transactions to the degree that their content is unusually opaque and seems to involve code words that are consistent with testimony from known buyers. See, e.g., Supp. J.A. 1 (mention of a "Q"); id. at 357 (Agent Guzzo's testimony that a "Q" indicated a quarter ounce of crack). Shippy's relatively frequent, brief visits to Foster's building during the surveillance period also

18

match the pattern of known buyers observed by investigators. While Shippy did attest to visiting another resident who lived in a unit in Foster's building, the duration of some of his stops was so short that when coupled with the coded language, it reasonably supports the inferences drawn by the jury that the visits involved momentary drug transactions. See, e.g., id. at 384-86, 820 (testimony that Shippy was parked at Foster's building, after calling to "remind [him] about the 14," for two to three minutes). Whether the evidence demonstrated that Shippy was carrying on his own entrepreneurial drug sales business with Foster as his supplier, on the one hand, or was a mere innocent in the wrong place at the wrong time on the wrong cell phone, on the other hand, were quintessentially jury questions.

Shippy calls our attention to United States v. Hickman, 626 F.3d 756 (4th Cir. 2010), as an example of a case where direct evidence of a defendant's participation in a drug trafficking conspiracy supported denial of a motion for acquittal. Indeed, Hickman involved a defendant whose purchase of drugs had been arranged by fairly explicit phone calls monitored by law enforcement, and who in fact was found to have a quantity of heroin in his car when he was eventually stopped and searched. Id. at 761. Shippy, in contrast, was never observed with any

drugs, nor were drugs or cash found in his home.[10] But these obvious differences between the two cases provide no support to Shippy. The absence of any evidence of seizures of drugs, cash or paraphernalia from Shippy or Shippy's residence does not defeat the Government's case as a matter of law.

The evidence adduced at trial was essentially that Shippy's conduct of contacting and visiting Foster matched the stark patterns of known customers. Furthermore, corroborating the inference of a drug purchase purpose for his visits most strongly are three particular phone calls in which Foster and Shippy discussed drugs with relative specificity. On December 8, Shippy discussed purchasing a "Q" (i.e., quarter ounce, or 7 grams, of crack cocaine) from Foster. On December 27, Foster told Shippy, "you got to check that chicken out too man it cooks pretty good." J.A. 804. From this evidence, and testimony from Agent Guzzo that "Q" and "chicken" both refer to crack, the jury could reasonably infer that Shippy was involved in a conspiracy to possess and distribute cocaine base. Approximately one month later, on January 25, 2009, Shippy also referred to "those

---

[10] We note that Foster was arrested approximately two months before Shippy, who admitted he knew that Foster had been taken into custody (although he testified to believing that tax evasion might have been the cause). There was clearly an opportunity for Shippy to remove drugs or cash from his residence if he suspected police might investigate him as an associate of Foster.

20

customers," id. at 818, a reference that any reasonable juror could conclude was an allusion to Shippy's customers, not to Shippy himself as a mere customer of Foster.

To summarize, the Government produced evidence at trial that established Shippy's movements matched those of Foster's crack cocaine buyers, and his conversations indicated discussion of crack cocaine quantities and arguably his own buyers. While Shippy denied that he was a participant in those calls, and he offered the jury innocent explanations for his intermittent presence at and around the Foster residence, the jury made those relevant findings against him, as it was authorized to do.[11] In light of the substantial evidence presented at trial, even if much of it was circumstantial, and deferring as we must to the jury's role in judging the weight and credibility of the testimony, Shippy has not satisfied his burden to make out a case of evidentiary insufficiency. United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007) ("A defendant challenging the sufficiency of the evidence faces a heavy burden.").

B.

---

[11] In addition to its assessment of Shippy's demeanor on the stand, the jury also had the benefit of comparing Shippy's voice in the recordings to what they heard when he testified. Tellingly, the jury's request during deliberations for dates and times of the recordings, to compare with images of his arrival at Foster's building, suggests the jurors' care and attention to their responsibilities.

21

Shippy also argues that he is entitled to a judgment of acquittal as to his conviction for use of a communication facility in committing, causing, or facilitating commission of a felony under federal drug trafficking law. 21 U.S.C. § 843(b). To obtain a conviction for a violation of § 843(b), the Government must prove that the defendant: (1) used a communication facility (in this case, a telephone); (2) to commit, cause, or facilitate the commission of a drug offense; and (3) did so knowingly and intentionally. Id.

Shippy asserts that the Government failed to provide sufficient evidence that he did anything more, if he did anything unlawful at all, than purchase an unspecified amount of crack cocaine for personal use, which is not a felony, Supp. Appellant's Br. 18-19, and which, if true, would not support conviction on the § 843(b) count. See Abuelhawa v. United States, --- U.S. ----, 129 S. Ct. 2102, 2107 (2009) (holding that a buyer who uses a telephone to make a misdemeanor drug purchase does not "facilitate" felony drug distribution because the term "facilitate" is limited to someone other than a principal or necessary actor). But Shippy's reliance on Abuelhawa is misplaced.

In essence, Shippy argues before us that even if the Government can show that he purchased crack cocaine from Foster (ironically, a proposition Shippy vigorously disputed in his own

22

testimony at trial), the evidence failed to prove he was involved in the distribution of those drugs to anyone else and in so doing used a telephone. We reject Shippy's contention. Taken in the light most favorable to the Government, and accepting the jury's factual findings (i.e., that Shippy and Foster were in fact discussing crack cocaine during their conversations), the evidence indicates the following specific purchase amounts:

| Date | Coded quantity | Decoded quantity |
|---|---|---|
| December 8, 2008 | "a Q" or "a half" | ¼ ounce (7 g.) or ½ ounce (14 g.) |
| December 27, 2008 | "half the whole" | ½ ounce (14 g.) |
| January 27, 2009 | "the 14" | ½ ounce (14 g.) |

Together with the circumstances already described, these quantities could reasonably be inferred to indicate an intent to distribute, even if at a relatively small scale.[12] It will be recalled also that Shippy made mention of "those customers." See supra pp. 20-21.

In sum, for the same reasons we conclude the Government adduced evidence sufficient to show Shippy's knowing participation in the overall conspiracy, we are satisfied that the jury did not act irrationally in finding that Shippy

---

[12] Testifying co-conspirator Lee, for example, made weekly purchases of 128 grams (4.5 ounces) of crack from Foster. Co-conspirator Renison testified to purchasing 20-60 grams, two or three times a week.

intended to distribute some if not all of the narcotics he purchased from Foster, and that he used the telephone in the course of his participation in the conspiracy. The amounts discussed above are not so small as to preclude, as a matter of law, a finding of intent to distribute, and circumstantial evidence concerning Shippy's use of a telephone to arrange drug transactions was rationally interpreted by the jury against him. Accordingly, the district court did not err in denying the motion for judgment of acquittal as to the communication count.

C.

Shippy next argues that the district court erred in imposing an enhanced mandatory minimum sentence of ten years' imprisonment. Under 21 U.S.C. §§ 841(a) and 846, the sentences for participants in drug conspiracies are set forth in § 841(b), which "creates a three-part graduated penalty scheme for drug distribution offenses, premised on the type and quantity of the drugs involved." United States v. Brooks, 524 F.3d 549, 557 (4th Cir. 2008). We held in Brooks that "'specific threshold drug quantities must be treated as elements of aggravated drug trafficking offenses, rather than as mere sentencing factors.'" Id. (quoting United States v. Promise, 255 F.3d 150, 156 (4th Cir. 2001) (en banc)).

Under the version of § 841(b) that was in effect both at the time Shippy committed the conspiracy offense and at

24

sentencing, the threshold quantity of cocaine base required for a sentence under § 841(b)(1)(B), the section at issue here, was five grams or more.[13] For the statutory minimums of § 841(b) to apply, the particular threshold drug amount must either be admitted or found by a jury, beyond a reasonable doubt, to be reasonably foreseeable to the defendant. Id. at 558.

As previously mentioned, the verdict sheet directed the jury to indicate the amount of cocaine base attributable to each defendant from among six choices: less than 50 grams, 50 - 149 grams, 150 - 499 grams, 500 grams – 1.49 kilos, 1.5 kilos – 4.49 kilos, or 4.5 kilos or more. As to Shippy, the jury found the smallest listed amount, "less than 50 grams of cocaine base." Without question, the jury was not offered the opportunity specifically to find that the amount attributable to Shippy was "less than five grams."

Thus, as the Government readily concedes, the district court erred, United States v. Collins, 415 F.3d 304 (4th Cir.

---

[13] Under that version of § 841(b)(1)(B), defendants committing covered offenses involving five grams or more of cocaine base "shall be sentenced to a term of imprisonment which may not be less than [five] and not more than [forty] years." 21 U.S.C. § 841(b)(1)(B). If the defendant commits such an offense after a prior conviction for a felony drug offense has become final, then the defendant "shall be sentenced to a term of imprisonment which may not be less than [ten] years and not more than life imprisonment." Id. Shippy's prior conviction thus rendered him subject to a ten-year minimum mandatory sentence for any drug amount equal to or more than five grams.

25

2005), and, although Shippy failed to object or to bring the requirements of Brooks to the attention of the district court, the error is plain under the applicable standard of review. See United States v. Olano, 507 U.S. 725, 732 (1993) (successful plain error review requires a showing that: (1) there was error; (2) the error was plain; and (3) the error affected defendant's substantial rights); Foster, 507 F.3d at 251 ("In this case, the jury never determined the individualized quantity of crack attributable to each defendant for the penalty purposes of § 841(b) . . . . Because the jury was not properly instructed under Collins, the defendants' jury did not properly determine the statutory threshold quantity of crack attributable to each of them. Accordingly, the first two prongs of Olano (error and plainness) are satisfied.").

The issue presented is whether the Collins error affected Shippy's substantial rights and, if so, whether we should exercise our discretion to correct the error in that it "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Lynn, 592 F.3d 572, 577 (4th Cir. 2010) (internal quotation marks omitted). We are satisfied that the district court's error did not affect Shippy's substantial rights.

For reasons similar to those material here, we declined to notice a Collins error in United States v. Jeffers, 570 F.3d 557

26

(4th Cir. 2009). There, we concluded that although the Collins error affected the defendant's substantial rights, i.e., he received a sentence 24 months greater than the otherwise applicable maximum sentence, we determined that a failure to correct the error would not affect "the fairness, integrity or public reputation of judicial proceedings." Id. at 570. This conclusion was based on our assessment that "overwhelming evidence" supported the imposition of the higher sentence. Id.

Although in this case the evidence of Shippy's involvement with more than five grams of crack cocaine is not properly described as "overwhelming," it is, nonetheless, considerably compelling. Indeed, we have no hesitation in concluding that there is no reasonable likelihood that the jury would have found a drug quantity of less than five grams.

The conversations between Shippy and Foster that the jury determined to be drug-related referenced, as noted above, at least three transactions that likely involved 7-14 grams of crack each. Supp. J.A. 1 (referencing a "Q" and "a half"); J.A. 804 ("half of the whole"); id. at 820 ("the 14"). To the degree that the jury found Shippy guilty of conspiracy, it is logically necessary to conclude that the jury credited the testimony of Agent Guzzo that the language used during the phone calls was code, and that this code indicated drug quantities. The record plainly indicates that the attributable quantity the district

27

court reached was consistent with (and even potentially more conservative than) the most likely conclusions of the jury.

Notably, at sentencing Shippy conceded that the proper quantity of crack attributable to him under the prosecution's evidence was 5-20 grams, and he requested application of the guideline range for that very amount. Supp. Appellant's Br. 24; J.A. 874 (objection to the draft PSR noting "the Defendant was responsible for at most one-half ounce of crack cocaine based on the evidence adduced at trial which equates to 14 grams therefore Mr. Shippy should be responsible for no more than 14 grams or at last between 5 and 20 grams of cocaine base"); id. at 829 (requesting the "actual guideline amount" of imprisonment). This concession was fully justified by the evidence.

## III.

For the reasons set forth herein, the judgment is

AFFIRMED