# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee-*
*Cross-Appellant,*

v.

JAIME FLORES ROSALES,
*Defendant-Appellant-*
*Cross-Appellee.*

Nos. 05-30260
05-30285

D.C. No.
CR-03-00311-007-
MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
April 13, 2007—Seattle, Washington

Filed February 13, 2008

Before: Alex Kozinski, Chief Judge, Raymond C. Fisher,
Circuit Judge, and Andrew J. Guilford, District Judge.*

Opinion by Judge Guilford

---

*The Honorable Andrew J. Guilford, United States District Judge for
the Central District of California, sitting by designation.

## COUNSEL

Allen R. Bentley, Seattle, Washington, for the defendant-appellant-cross-appellee.

Todd L. Greenberg and Sarah Y. Vogel, Assistant U.S. Attorneys, John McKay, United States Attorney, Seattle, Washington, for the plaintiff-appellee-cross-appellant.

## OPINION

GUILFORD, District Judge:

### *BACKGROUND*

This appeal and cross-appeal arise from the conviction of Jaime Flores Rosales ("Rosales") for three drug offenses. After a long jury trial lasting most of June 2004, Rosales was convicted on one count of conspiring to distribute 500 grams or more of cocaine (Count 1), and two counts of possessing cocaine with the intent to distribute (Counts 5 and 6). In the same trial, the jury found that another defendant, co-conspirator Alfonso Allan Brooks ("Brooks"), was guilty of many drug offenses, after his lawyer conceded liability on three of those crimes. *See United States v. Brooks*, 508 F.3d 1205 (9th Cir. 2007).

Rosales appeals his conviction on only Counts 1 and 5. On Count 1, he concedes that there was sufficient evidence to find that he was involved in a conspiracy to distribute cocaine. But he argues there was insufficient evidence that he could have reasonably foreseen that the quantity of cocaine involved in the conspiracy would be 500 grams or more. On Count 5, he argues there was insufficient evidence that he possessed cocaine on April 10, 2003, but on Count 6, he concedes that there was sufficient evidence that he possessed cocaine with intent to distribute on April 26 and 27, 2003. The government filed a cross-appeal challenging the district court's decision not to impose a sentencing enhancement under 21 U.S.C. § 841(b)(1)(B).

We conclude that there is sufficient evidence to affirm the convictions on Counts 1 and 5. We also conclude that the district court erred in failing to impose a sentencing enhancement under 21 U.S.C. § 841(b)(1)(B).

## *ANALYSIS*

## 1.  SUFFICIENCY OF THE EVIDENCE

Rosales's sufficiency of the evidence arguments focus on two points. The first, on Count 1, is whether it was reasonably foreseeable to Rosales that 500 grams or more of cocaine would be involved in the conceded conspiracy. The second, on Count 5, is whether a "corner" ("*esquina*" in Spanish), referenced in the April 10 transaction, was cocaine.

Twice at trial Rosales moved for acquittal under Federal Rule of Criminal Procedure 29 asserting that there was insufficient evidence to convict, and twice the district court denied the motion. Although we apply a de novo standard when reviewing a decision on a Rule 29 motion, we must affirm the trial court if, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt." *United States v. Hinton*, 222 F.3d 664, 669 (9th Cir. 2000). Viewing the evidence in the light most favorable to the prosecution requires us to " 'presume . . . that the trier of fact resolved any . . . conflict[ing inferences] in favor of the prosecution.' " *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000) (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992) (plurality opinion)).

Evidence at trial must be considered as a whole. Trial evidence can be like abundant threads woven into a tapestry. An individual thread may mean very little until the tapestry is completed and a clear image appears beyond any reasonable doubt. Those at trial viewing the nature and quality of the different threads as they are presented are best able to evaluate

the final picture. *See House v. Bell*, 126 S. Ct. 2064, 2078 (2006) ("Deference is given to a trial court's assessment of evidence presented to it in the first instance.").

**[1]** In this trial, many wiretap conversations between men who were undeniably cocaine traffickers were presented, forming the warp in this tapestry's weave. The evidence sufficiently established that these men spoke the language of those engaged in trade, and specifically cocaine trade, using code words to express the key elements of trade: the cocaine, the quality, the quantity, and the price. Threads of otherwise meaningless conversations took on meaning only when tied together as cocaine merchants using code words when talking about their trade. *Cf. United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997) ("[T]here is a specialized jargon endemic to the illegal drug distribution industry. A primary purpose of this jargon is to conceal from outsiders, through deliberate obscurity, the illegal nature of the activities being discussed.").

**[2]** This conclusion about code words was supported at trial in different ways. A co-conspirator testified that code was used to refer to drugs and money during telephone calls to avoid police detection, and there was expert testimony that drug dealers use code to avoid detection. Rosales concedes that the intercepted conversations "permitted a reasonable inference that the speakers were not discussing the difficulty of finding competent help or defects in certain legal documents, but rather, were using code words to avoid speaking explicitly about drugs." The subjects of "competent help" and "documents" were discussed on April 27. Rosales concedes that "the most striking aspect of the government's proof was the incongruous mixture of terms used in the intercepted calls on April 27th."

**[3]** These "striking" April 27 conversations provide significant threads in the broader picture of cocaine traffickers plying their trade. This broader picture is relevant to both Counts

1 and 5, so we begin by reviewing the April 27 conversations before analyzing the specifics of Counts 1 and 5. Otherwise incongruous comments on April 27 make sense only when viewed in the context of a complaint about the need to replace low quality cocaine, and efforts to find satisfactory cocaine, with code words used to describe the cocaine and its quality.

The April 27 exchanges began with Rosales and Manuel Garcia-Trujillo ("Garcia-Trujillo") talking about a "little friend" and exchanging an "old lady" who "doesn't even know how to cook."

GARCIA-TRUJILLO: What's up?

ROSALES: Just hanging around. It's just that the little friend you introduced me to, turned out bad.

GARCIA-TRUJILLO: Oh, the small one?

ROSALES: Well, that's not the problem, but the other one.

GARCIA-TRUJILLO: Oh, the big one?

ROSALES: Yeah. But the old lady turned out bad.

GARCIA-TRUJILLO: Oh.

ROSALES: She doesn't even know how to cook, she doesn't know anything . . .

GARCIA-TRUJILLO: Really?

ROSALES: . . . how to make the bed, or anything. And a bastard got sick on us.

GARCIA-TRUJILLO: Oh.

ROSALES: But bad, bad, bad . . [.] That's why I want to see if you . . . you can exchange her for me, even if it's for a . . . for another one like the . . . the small one.

GARCIA-TRUJILLO: Oh, yes . . .

A few minutes later Rosales appeared to be following up on his conversation with Garcia-Trujillo in a telephone call with Brooks. Rosales told Brooks that everything would be fine and that Brooks should call his friend, and Brooks replied that he would call his friend right away. Moments later, there was a call between Brooks and Ronald Harbin ("Harbin") discussing "documents" that "have not been notarized" and were "broke apart." Bricks of cocaine, of course, can be broken apart.

BROOKS: Good morning, Ronald.

HARBIN: Hey, what are you up to?

BROOKS: [LAUGHS] Not much. Hey, I just, ah . . . I want to let you know . . . You know the documents I brought to you over last night?

HARBIN: Aha.

BROOKS: OK. Those documents have not been notarized. So it looks like they may not

> work for you as well as the other ones.
>
> . . . .
>
> HARBIN:   . . . I broke it apart though.
>
> BROOKS:   It's OK.

Later on April 27, Rosales told Brooks that they would be able to "exchange it right away," and that Brooks should give the "other one" so that Brooks could fulfill his "commitment." Later that evening Brooks called Saul Ruiz ("Ruiz") and left the message that follows about "documents."

> Hey, old man, what's up? How are you doing? Good, or what? Look, old man, ah . . . I'm . . . I'm bringing you the documents over there at 6 pesos and they mark at 75. Is that all right? If anything comes up, I'll be calling you. Ah, I was waiting to solve a situation, and it/he didn't show up. In other words, well, that's where we are. Now if that's all right, or if it's not, then, let me know. I'll try to solve the situation one way or another, OK? So, we have to give a . . . We have to give some documents at, like I told you, at 6 pesos and they mark at 75 to 80. You see, I mean, well you'll know if they pass the . . . the . . . the indicator test, and let me know. OK. Fine then, son. Take care.

**[4]** Expert testimony established that for cocaine, the normal purity range at the distribution level is 70 to 80 percent. Thus a juror could infer that cocaine was the merchandise, and its purity was "75 to 80" percent. Rosales concedes that "[t]he jury could reasonably infer that Brooks sought to arrange to have Harbin return poor-quality drugs to him and that Rosales sought to arrange with Garcia-Trujillo to exchange those poor quality drugs for something better."

We now review specific evidence concerning Counts 1 and 5 in the context of code being used to talk the language of cocaine trafficking.

### 1.1    Count 1 - Conspiracy to Distribute 500 Grams or More of Cocaine

Rosales concedes that he was properly convicted of conspiring to distribute cocaine, but he argues there was insufficient evidence that he could have reasonably foreseen the conspiracy would involve 500 grams or more of cocaine. If he were right, then the district court would have violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by sentencing him under section 841(b)(1)(B) and thereby "expos[ing]" him to a higher maximum penalty than would otherwise have been available under section 841(b)(1)(C). *United States v. Thomas*, 355 F.3d 1191, 1201 (9th Cir. 2004). Rosales may only be exposed to section 841(b)(1)(B)'s penalties if the evidence is sufficient to support the jury's verdict that the 500-gram quantity "either (1) fell within the scope of the defendant's agreement with his coconspirators or (2) was reasonably foreseeable to the defendant." *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003).

Evidence on Count 1 included (1) intercepted telephone conversations, (2) surveillance testimony, (3) expert testimony, and (4) evidence of a hydraulic press and two metal molds.

[5] The intercepted telephone conversations evidence substantial activity involving cocaine, with Rosales playing a key role, and the jury convicted Rosales on Counts 5 and 6 for possessing cocaine on different dates with the intent to distribute. The conversations also occasionally gave more direct evidence that the amount of cocaine involved was 500 grams or more.

For example, in a telephone conversation on April 25, 2003, Rosales promised Garcia-Trujillo 16 "titles" in the fol-

lowing exchange which suggests cocaine was the merchandise, and the quantity was a full kilogram.

GARCIA-TRUJILLO: Oh, what's going on? I'm Genaro's friend okay?

ROSALES: What's up?

GARCIA-TRUJILLO: What do you say, then?

ROSALES: Just here, son, resting.

GARCIA-TRUJILLO: All right.

ROSALES: And is everything fine or what?

GARCIA-TRUJILLO: Yes. It's just that we have that already, to see what . . . what you said.

ROSALES: Do you remember the other apartment?

GARCIA-TRUJILLO: Yes.

ROSALES: Do . . . do you remember the other one?

GARCIA-TRUJILLO: Yes.

ROSALES: OK. Go there, OK?

GARCIA-TRUJILLO: A . . . all right. No, I was ju . . . just letting you know, well to see how many . . .

ROSALES:              Yeah . . .

                      [VOICES OVERLAP]

GARCIA-TRUJILLO: to see . . . to *see how many titles you had*.

ROSALES:              Yeah, *half of what* he tol . . . the . . . what *Genaro told you*.

GARCIA-TRUJILLO: Oh, *How many is it? Eight*?

ROSALES:              *Yes. And then like in one week already, all the rest will be there*.

GARCIA-TRUJILLO: All right.

(Emphasis added.)

**[6]** Rosales concedes that "[a] reasonable juror could have found that Rosales obtained cocaine from Garcia-Trujillo and transferred it to Brooks." Thus, Garcia-Trujillo, as a seller, would be interested in the price to be paid to him, and a juror could infer that the word "titles" in the April 25 conversation referred to money. Expert testimony was presented that the going rate for a kilogram of cocaine was $16,000, and that when drug dealers discuss money they usually leave off the zeros. A juror could infer that Rosales was offering to buy $16,000 worth of cocaine, a kilogram, when he stated that he would pay 8 "titles" now and 8 "titles" in another week. Thus, it would have been foreseeable to Rosales that the conspiracy involved at least 500 grams — half a kilogram — of cocaine.

**[7]** Other wiretap conversations gave strong evidence of the amount of cocaine involved. For example, Rosales stated that "half a kilo" might be exchanged in a deal involving one of

his cars. Thus, a juror could infer that Rosales was involved with "half a kilo" — 500 grams — of cocaine. Further, during this same conversation, Rosales stated that he told someone, "You know what kind of person I am. I deal with lots of money, I dealt with lots of money with you, and I never let you down . . . ." Evidence that Rosales claimed to deal with "lots of money" provides modest support for the inference that Rosales knew that more than 500 grams of cocaine were involved. *Cf. United States v. Jabara,* 618 F.2d 1319, 1329 (9th Cir. 1980) (unexplained wealth "is relevant in a narcotics conspiracy case"), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) (en banc).

**[8]** And there is still more supporting evidence. When the police searched an apartment used by the conspiracy, they found a hydraulic press and two metal molds that could form a rectangular brick. The apartment belonged to co-conspirator Brooks; Rosales lived there until shortly before the search. An expert testified that the hydraulic press and metal molds could be used to produce kilogram bricks of cocaine. Rosales argues that this evidence is not useful for Count 1 because the hydraulic press was in the apartment long before Rosales moved in, and there was no evidence that Rosales had access to the locked safe containing the metal molds. But even if Rosales did not have access to the metal molds, the huge hydraulic press in the living room of a co-conspirator's apartment supports the jury's verdict that it was reasonably foreseeable that the conspiracy involved 500 grams or more of cocaine.

**[9]** Viewing all the evidence together in the light most favorable to the prosecution, while resolving any conflicting inferences in favor of the prosecution, we conclude there was sufficient evidence to convict on Count 1.

### 1.2 Count 5 - Possession with Intent to Distribute on April 10, 2003

Evidence on Count 5 included (1) intercepted telephone conversations, (2) surveillance testimony, (3) expert testi-

mony, and (4) testimony about the shape and size of a quarter kilo of cocaine.

On April 10, Rosales and Brooks spoke on the phone in Spanish. They began their conversation by talking about a fight Rosales had with his girlfriend. But in an incongruous aside in the middle of the conversation Brooks asked Rosales for "any little thing" because it was "an emergency." In response Rosales offered Brooks a "corner." As with other intercepted conversations, the jury heard the Spanish-language recording and was given a transcript of it. That transcript reproduced the conversation in two languages: On one side of the page were the Spanish words actually spoken, and on the other, a line-by-line English translation. The English translation of the relevant part of the incongruous aside follows.

> BROOKS:      Yes, I know, how are you doing now, are you in bad shape or what? how are you?
>
> ROSALES:      I'm fine.
>
> BROOKS:      Do you think . . . that you could get me any little thing so as to stop by, brother, it's just that . . . it's that it is an emergency, crazy man.
>
>      [VOICES OVERLAP]
>
> ROSALES:      What do you want?
>
> BROOKS:      This is an emergency . . . whatever you have.
>
> ROSALES:      A "corner".
>
> BROOKS:      No, and that's . . . perfect.

ROSALES:   Ah, but I'll see you, I'll see you a little later, I'll see you at about 8.

BROOKS:    [Laughs] Listen.

[VOICES OVERLAP]

ROSALES:   Seven.

**[10]** After Rosales promised Brooks a "corner" at "seven," the following events occurred: (1) around seven o'clock Rosales drove to Brooks's apartment and met Brooks who was waiting at the curb; (2) while sitting in his car, Rosales handed Brooks a red plastic bag out the car window; (3) the red plastic bag contained something approximately the size and shape of an oblong softball; (4) while Rosales stayed in his car, Brooks took the red plastic bag to where Brooks's car was; (5) Brooks was then seen carrying only his phone. A juror could properly find that the "corner" Rosales promised to give Brooks at seven o'clock was in the red plastic bag Rosales handed Brooks shortly after seven o'clock. Thus, we must affirm the conviction on Count 5 if there was sufficient evidence that the "corner" in the red plastic bag was cocaine.

**[11]** Numerous circumstances support the reasonable inference that the "corner" in the red plastic bag was cocaine. First, in the context of other conversations and evidence, "corner" could properly be found to be code for cocaine. Indeed, Rosales concedes that in other conversations, there was "a reasonable inference that the speakers were . . . using code words to avoid speaking explicitly about drugs." More specifically, the jury heard testimony from a government witness on the meaning of the Spanish word "esquina." Rosales used this word in the April 10 Spanish-language conversation with Brooks, and the jury had been presented with "corner" as the English translation of the word. The government witness testified as follows:

Q.  Are you familiar with a specific term for a quarter kilo other than quarter kilo?

A.  I've also heard it as esquina.

Q.  Is that a Spanish or English word?

A.  It's Spanish. Quarter.

Q.  Are you familiar with an English word?

A.  A quarter. Quarter key. Quarter.

**[12]** From this testimony, the jury could conclude that the Spanish word "esquina" meant "a quarter kilo." From the English-language translation of the April 10 conversation, previously quoted, the jury knew that Rosales promised to bring Brooks "a corner." And from the Spanish transcript set alongside that English translation, the jury knew that what Rosales actually promised, in Spanish, was "una esquina." Putting all this together, the jury could infer that Rosales promised to bring Brooks "a quarter kilo."

The next circumstance supporting the reasonable inference that the "corner" in the red plastic bag was cocaine is that the exchange was between two men the jury found on other charges were heavily involved in cocaine trafficking. Next, as noted earlier concerning another transaction in the same month, Rosales concedes that "[a] reasonable juror could have inferred that Rosales obtained cocaine from Garcia-Trujillo and transferred it to Brooks." Next, the circumstance of passing the red plastic bag out a car window suggests that it was an illegal substance. Next, the request for "any little thing" as an "emergency" is consistent with drug transactions. Next, a narcotics officer testified that a quarter kilo of cocaine was "approximately the size of an oblong softball", the same size and shape of the red plastic bag, and that he believed the event on April 10 was a drug delivery. Next, "corner" was

used apparently to mean drugs in a discussion on April 27 between Garcia-Trujillo and his brother which mentioned Rosales by his nickname "Chilango." Finally, when the police eventually arrested Brooks and Rosales, cocaine was present.

**[13]** Viewing all the evidence together in the light most favorable to the prosecution while resolving any conflicting inferences in favor of the prosecution, a rational juror could find beyond a reasonable doubt that these drug dealers talking in code used "corner" to mean cocaine. There was no proverbial smoking gun on Count 5, and when the facts are considered individually, no single fact could support a conviction on Count 5. But when the facts and inferences are considered cumulatively and all the threads are connected, there is a unifying conclusion that explains the events on April 10, and that conclusion is that on that date, Rosales delivered to Brooks a red plastic bag containing cocaine. We cannot conclude that a juror would be irrational in finding beyond a reasonable doubt that this transaction between cocaine dealers speaking in code involved cocaine. We therefore conclude that there was sufficient evidence to convict on Count 5.

## 2.   THE SENTENCING ENHANCEMENT

The government filed a cross-appeal arguing that the district court should have imposed a sentencing enhancement under 21 U.S.C. § 841(b)(1)(B). This enhancement would increase Rosales's mandatory minimum sentence for prison and supervised release because of Rosales's 1997 state conviction under Revised Code of Washington § 69.50.401(d), which the government claims is a felony drug offense. This state conviction resulted from Rosales's guilty plea. Rosales makes numerous arguments in response. But the language of the applicable statutes and cases and the record show that Rosales's state guilty plea, sufficiently acknowledged by his counsel's signature, was to a crime requiring this enhancement.

### 2.1 The Double Jeopardy Clause Does Not Bar This Appeal

**[14]** Rosales argues that under our decision in *United States v. Blanton*, 476 F.3d 767 (9th Cir. 2007), the Fifth Amendment's Double Jeopardy Clause bars the appeal of the district court's refusal to impose the sentencing enhancement. But *Blanton* doesn't apply here because *Blanton* considered the government's appeal from a judgment of acquittal, entered after a bench trial. *See id.* at 769. Here, by contrast, the government doesn't appeal an acquittal—Rosales was convicted by a jury. Instead, the government appeals the district court's decision not to increase Rosales's sentence pursuant to 21 U.S.C. § 841(b)(1)(B). The Double Jeopardy Clause doesn't bar the government from appealing such sentencing decisions. *Monge v. California*, 524 U.S. 721, 729 (1998). We noted in *Blanton* that *Apprendi* undermined *Monge*. *See Blanton*, 476 F.3d at 772. *Monge* depended on the distinction between "sentencing factors" and "elements" that the Court later rejected in *Apprendi. Id.* Yet whatever the problems with *Monge*'s rationale, its holding remains valid: The Double Jeopardy Clause does not prohibit the government from appealing a sentencing ruling that does not result in acquittal. *See, e.g., United States v. Booker*, 543 U.S. 220, 267 (2005) (vacating defendant Fanfan's sentence and remanding).

### 2.2 The 1997 Washington State Conviction Requires the Sentencing Enhancement

**[15]** Rosales was convicted on Count 1 of conspiring to distribute 500 grams or more of cocaine, violating 21 U.S.C. §§ 841(a)(1) and 846. Under 21 U.S.C. § 841(b)(1)(B), the mandatory minimum sentence increases from five years to ten years for defendants with "a prior conviction for a felony drug offense." A "felony drug offense" is defined as "an offense that is punishable by imprisonment for more than one year under any law of . . . a State . . . that prohibits or restricts conduct relating to narcotic drugs . . . ." 21 U.S.C. § 802(44).

To determine whether a state "felony drug offense" is punishable by more than one year, we look to the state's statutory maximum sentence and not the maximum sentence available under the state sentencing guidelines. *United States v. Murillo*, 422 F.3d 1152, 1153-54 (9th Cir. 2005) ("in determining whether a state conviction is punishable for more than one year's imprisonment for purposes of a federal criminal statute predicated on a prior felony conviction or for federal sentencing purposes, we look to the maximum penalty allowed by statute.").

**[16]** The maximum penalty for the crime to which Rosales pled guilty is five years of imprisonment. Wash. Rev. Code § 69.50.401(d). Because this maximum is greater than one year, the conviction is a felony drug offense under 21 U.S.C. § 841(b)(1)(B) and the mandatory minimum sentence must be imposed.

**[17]** Rosales cites legislative history and policy to argue that his 1997 state conviction could not qualify as a felony drug offense because the state conviction was only for simple possession. But "[s]tatutory interpretation begins with the plain language of the statute." *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999). "If the language of the statute is clear, we need look no further than that language in determining the statute's meaning." *Id*. With a "straightforward statutory command, there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6 (1997). Here, section 802(44) defines "felony drug offense" as "an offense . . . that prohibits or restricts conduct relating to narcotic drugs." Possessing drugs is "conduct relating" to them. The statutory command here is straightforward, and Rosales's arguments about simple possession must fail.

Our case law follows the clear language of the statute. In *United States v. Meza-Corrales*, 183 F.3d 1116 (9th Cir. 1999), we held that when determining whether a prior conviction supported an enhancement under 21 U.S.C. § 841, "the

law at issue itself need not relate to (i.e., make mention of) narcotic drugs but only need mention (for purposes of prohibition and restriction) some conduct that itself relates to (i.e., involves the use, *possession*, or sale of) narcotic drugs." *Id.* at 1127 (emphasis added). Other circuits addressing this issue have reached the same conclusion. *See United States v. Curry*, 404 F.3d 316, 319 (5th Cir. 2005) (concluding that "the district court need only verify that the previous convictions were (1) felonies and (2) drug offenses"); *United States v. Spikes*, 158 F.3d 913, 932 (6th Cir. 1998) (concluding that "the statute encompasses drug offenses that involve the simple possession of drugs"); *United States v. Hansley*, 54 F.3d 709, 718 (11th Cir. 1995) (concluding that 21 U.S.C. § 841(b)(1)(A) applies to convictions for simple possession).

[18] Accordingly, we conclude that the district court erred in failing to impose the sentencing enhancement under 21 U.S.C. § 841(b)(1)(B).

## *CONCLUSION*

We **AFFIRM IN PART** and **REVERSE IN PART** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.