**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

v.

SAMUEL NAVARRETTE-AGUILAR,
AKA Guayabo,
            *Defendant-Appellant*.

No. 14-30056

D.C. No.
3:12-cr-00373-
HZ-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted
March 3, 2015—Portland, Oregon

Filed December 28, 2015

Before: Raymond C. Fisher, Richard A. Paez,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Paez

**SUMMARY**[*]

**Criminal Law**

The panel affirmed in part, reversed in part, and vacated in part a criminal judgment in a case in which a jury (1) found the defendant guilty of conspiracy to distribute heroin, distribution of heroin, and possession of heroin with intent to distribute; and (2) made a special finding that the quantity of heroin was at least one kilogram, triggering a mandatory minimum twenty-year sentence under 21 U.S.C. § 841(b)(1)(A)(i).

The panel concluded, as did the district court, that the testimonial and physical evidence cannot support a finding of one kilogram. The panel held that the district court erred, however, in determining that the pattern of transactions permitted the jury to conclude that members of the conspiracy would have eventually distributed one kilogram of heroin. The panel wrote that it would be speculative to infer that the defendants agreed to any future transactions such that they would reach the one kilogram mark. The panel held that the error was not harmless, and therefore reversed the jury's quantity finding, vacated the sentence on all counts, and remanded for re-sentencing.

Affirming the convictions, the panel held that the district court did not abuse its discretion when it permitted the government to ask the defendant's sister, a defense witness, about the defendant's prior convictions, where the witness

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

opened the door to impeachment. The panel concluded that even if the district court did abuse its discretion, the error was harmless.

## COUNSEL

Per C. Olson (argued), Hoevet Boise Olson Howes, Portland, Oregon, for Defendant-Appellant.

Kelly A. Zusman (argued), Appellate Chief, Assistant United States Attorney and S. Amanda Marshall, United States Attorney for the District of Oregon, Portland, Oregon, for Plaintiff-Appellee.

## OPINION

PAEZ, Circuit Judge:

Samuel Navarrette-Aguilar ("Navarrette") appeals his conviction and sentence. A jury found him guilty of conspiracy to distribute heroin, distribution of heroin, possession of heroin with intent to distribute, and made a special finding that the quantity of heroin was at least one kilogram. Navarrette argues that substantial evidence did not support the jury's quantity finding. The evidence of historical transactions adduced did not amount to one kilogram. Navarrette maintains that when the district court denied his motions for judgment of acquittal, it erred in determining that the *pattern* of transactions permitted the jury to conclude that members of the conspiracy would have eventually distributed one kilogram of heroin. Navarrette further argues that the district court abused its discretion when it permitted the

government to ask a defense witness on cross-examination about his prior convictions for drug trafficking and escape. Although we affirm Navarrette's convictions on the conspiracy and distribution counts, we reverse the district court's ruling on the jury's quantity finding, vacate his sentence, and remand for re-sentencing.

## I.

Navarrette was charged with Conspiracy to Traffic Heroin in a quantity of one kilogram or more; Distribution of Heroin Resulting in Death; and Possession with Intent to Distribute Heroin. 21 U.S.C. §§ 841, 846. He was also charged with the penalty provision for distributing a kilogram or more of heroin, 21 U.S.C. § 841(b)(1)(A)(i), which provides for a mandatory minimum twenty-year sentence for a defendant who, like Navarrette, has a prior felony drug conviction. The government also charged him with the penalty provision for distributing a schedule I controlled substance resulting in death or serious injury, 21 U.S.C. § 841(b)(1)(C). The government charged two co-defendants along with Navarrette: Saul Guzman-Arias, who proceeded to trial with Navarrette, and Antonio Equihua-Ramirez, who pled guilty and became a witness for the prosecution.

A jury trial commenced on June 4, 2013. Because this appeal turns on whether there was substantial evidence to support the jury's finding that Navarrette and his co-defendants conspired to distribute at least one kilogram of heroin, we discuss the evidence produced at trial in detail.

The government investigated and prosecuted Navarrette as a "Len Bias"[1] case—that is, they sought to prove a supply chain directly linking the top of the chain, Navarrette, to the heroin overdose death of a woman named Erin Freeman. Distribution of a schedule I or II narcotic resulting in a death or serious injury carries a twenty-year mandatory minimum sentence, and a mandatory life sentence for those with a prior felony drug conviction. 21 U.S.C. § 841(b)(1)(C). Seeking this heavy penalty, the government sought to prove the connections among the members of the supply chain. As the evidence at trial showed, the investigation proceeded by using information from lower-level dealers to pursue higher-level distributors.

The government presented the jury with a narrative of the investigation process through the testimony of several officers, including Portland Police Officer Tim Manzella. Officer Manzella testified that, with the assistance of Freeman's boyfriend, he set up a controlled purchase of heroin from her immediate supplier, Bruce McDaniel. While watching McDaniel's house, Officer Manzella saw Josef Burns arrive; after he left, Manzella conducted a traffic stop

---

[1]     Many of the provisions of 21 U.S.C. § 841, including the twenty-year minimum prison term for causing a heroin overdose death, are often referred to as the Len Bias laws after a popular college basketball star. Len Bias played basketball for the University of Maryland until a drug overdose caused his untimely death in 1986. Congress enacted the provisions of 21 U.S.C. § 841 under the theory that but for their purchase of drugs the overdose victims would not have died.

Katherine Daniels & Carol M. Bast, *Difficulties in Investigating and Prosecuting Heroin Overdose Cases*, 41 Crim. L. Bull. 513, 517 (2005).

of Burns. During their encounter, Burns admitted that he was McDaniel's heroin supplier. Officer Manzella then engineered another controlled purchase of heroin using Burns, which led local law enforcement officers to the next supplier up the chain, Antonio Equihua-Ramirez. Equihua-Ramirez was arrested at the buy location, and officers found sixty-two grams of heroin and between $7,600 and $7,800 in cash in his vehicle. Equihua-Ramirez agreed to cooperate with the police and consented to a search of his home, where police found approximately thirteen grams[2] of heroin. Officer Manzella testified that Equihua-Ramirez had told him that the cash in his car was the profits from his sale of 150 grams of heroin, which he planned to turn over to his supplier, who had "fronted" him the drugs. Additionally, upon seizing Equihua-Ramirez's phone, Officer Manzella found a text message, sent to a number later determined to be Navarrette's, in which Equihua-Ramirez attempted to place an order for eight more pieces of heroin (200 grams) once he finished selling what he had.

Using Equihua-Ramirez, officers set up another controlled buy, this time from Equihua-Ramirez's supplier, whom he knew as "Califas," for the 200 grams that Equihua-Ramirez had already attempted to order. Officers arrested Saul Guzman-Arias, who appeared at the appointed time. Equihua-Ramirez identified him as the go-between who delivered the drugs that Equihua-Ramirez ordered from "Califas." Officers searched Guzman-Arias's car and

---

[2] Throughout their testimony, witnesses used different measurements – ounces, pieces, and grams – to describe the quantities of their transactions. An ounce is approximately twenty-eight grams; a "piece" is approximately twenty-five grams. We have converted all measurements to grams using this scale.

recovered 199.03 grams of heroin (the eight piece order) from a hidden compartment, capable of holding up to forty pounds of contraband, in his car. The police officers obtained cell site information relating to the phone Equihua-Ramirez used to place orders for heroin and used GPS to find the location of the phone he called, belonging to "Califas." Police arrested "Califas," revealed to be Navarrette, at his home. They did not find any drugs, but they did recover $1,860 in cash, and also discovered a large hidden compartment in his vehicle that could have held up to thirty pounds of contraband. Thus, the total amount of heroin recovered and presented as physical evidence at trial was approximately 274 grams.

In addition to the physical evidence, the government presented several defendants' phone records, as well as a few wiretapped calls from a federal investigation that had also ensnared Guzman-Arias, but none of these yielded evidence of the specific quantity of heroin transacted. Instead, the phone records presented, which included the records of Equihua-Ramirez, Navarrette, and Guzman-Arias, showed the number and frequency of calls and text messages among several members of the conspiracy. Local law enforcement officers also testified that they used a call placed from Equihua-Ramirez to Navarrette to triangulate the location of Navarrette, in order to arrest him, as evidence of Navarrette's identity as "Califas." As none of these other pieces of evidence would permit the jury to find that the conspiracy involved at least a kilogram of heroin, the government's main evidence of quantity came from the testimony of Equihua-Ramirez and Burns.

Burns testified that, during the time period alleged (approximately two and a half months, from mid-March to

early June), he only purchased heroin from Equihua-Ramirez, and Equihua-Ramirez testified that he only purchased heroin from Navarrette. Equihua-Ramirez further testified that Burns was his biggest customer, and his "[a]bout five" other customers only bought about a gram of heroin at a time, without specifying in greater detail how much heroin they purchased. Therefore, the government had to prove an agreement to distribute a kilogram of heroin from either a) Equihua-Ramirez's testimony as to how frequently he purchased heroin from Navarrette; b) Equihua-Ramirez's testimony as to how frequently he sold heroin to Burns; or c) Burns's testimony as to how frequently he purchased heroin from Equihua-Ramirez.

## A. Testimony of Josef Burns

Josef Burns could not state with certainty how many times and in what quantities he had purchased heroin from Equihua-Ramirez. For example, Burns initially stated that he had purchased heroin "more than a dozen times," but later said that he "[did]n't know [how many times]." When pressed on cross-examination, he agreed that a more realistic range was twelve to sixteen transactions, and stated "I mean, whatever. I mean, I'm not sure. I can't exactly say." On cross-examination, Burns also waffled on how long he had been buying from Equihua-Ramirez:

> Q. Yeah. Is it possible your relationship started sometime in late April?
>
> A. In April?
>
> Q. Correct. So it would have been about a month and a half?

A. March, April, something like that.  April, May, June, yeah, something around there.

Q. You don't really have a definite memory of that?

A. I don't have a definite—I don't have a definite time on that.

Describing his purchasing practices, Burns stated that he began by buying "one piece [twenty-five grams] and then two or three."  He testified that he could not estimate the total amount of heroin that he purchased, but that it took him "a month or two" to "wor[k] up to two or three pieces."  We note again that the entire time period of the conspiracy alleged was approximately two and a half months.  When questioned about the frequency with which he purchased heroin, Burns stated that it could be one or two times a week, but also "maybe a few more times . . . maybe three or four max."  He went on to explain that the frequency with which he purchased and the amount he purchased "would all just depend" on the level of demand, which was "different all the time."  The variation in the amount Burns purchased is borne out by other record evidence.  Notably, on May 26, Burns received a text message from Equihua-Ramirez asking him why he was not purchasing more heroin.  When presented with this evidence, Burns responded

Yeah.  I think I just—I just hadn't called them in a little bit or whatever.  I was not very—I didn't really want to sell heroin.  I did it because I didn't know what else to do, really. I couldn't do what I used to do, any of the

jobs I used to do.  But I didn't want to do it.
I just did it because—I don't know.

Burns testified several times that he had difficulty remembering details of the time period in question.  For example, when questioned more specifically about his practice of selling heroin, Burns answered, "I'm trying to think.  I'm not prepared for all this.  I can't really remember." And, later, Burns stated in response to further questioning: "I'm not really on it. . . . I just had a lot going on in the last year since this happened so I haven't been dealing with any of this."

In sum, Burns's testimony was vague; he could not provide an estimate as to how much heroin he sold or purchased, and could not clearly remember or describe his practices during the time in question.

## B. Testimony of Antonio Equihua-Ramirez

Like Burns, Equihua-Ramirez gave equivocal testimony regarding the frequency with which he bought and sold heroin.  Officer Manzella's testimony revealed that, before trial, Equihua-Ramirez contradicted himself in his statements to the police.  For example, he initially told Officer Manzella that he had been dealing for a period of six months, but later stated that he had only been dealing since mid-March.  It "seemed to [Officer Manzella] that he was pretty confused about the exact start and end date."  Equihua-Ramirez also gave different statements to police at different times regarding the amount that he sold to Burns.

At trial, Equihua-Ramirez testified that he began selling heroin in March of 2012, upon taking over the business of a

friend of his while that friend returned to Mexico. It was to be a temporary arrangement. Equihua-Ramirez only bought drugs from "Califas," the name by which he knew Navarrette. Navarrette "fronted" him the drugs, meaning that Equihua-Ramirez only paid for the drugs after he sold them to others, and did not order more until he had sold all of the drugs that he had previously bought. It also meant that he did not buy more than he thought he could sell.

Equihua-Ramirez testified that he began by ordering an ounce (twenty-eight grams) at a time, which would take him about three days to sell. Equihua-Ramirez further testified that he purchased drugs "thirteen or fourteen" times. Equihua-Ramirez later testified that he purchased heroin from his supplier "between ten and thirteen [times]," but that he "[did]n't remember well." He maintained that it could not have been fewer than ten times.

Equihua-Ramirez testified that, while he did not always purchase a single ounce (28 grams), the most that he ever purchased at a single time was four ounces (112 grams), which he did shortly before he was arrested. However, his last *order* had been for 200 grams; this would have been his largest order.

Equihua-Ramirez testified that Josef Burns was his biggest customer, and that the last sale that he made to Burns was for fifty grams. He further stated that Burns usually purchased "sometimes one, sometimes two" pieces at a time (twenty-five to fifty grams), and once purchased three pieces (seventy-five grams). At one point, Equihua-Ramirez testified that there was a period in April during which the heroin was bad, and his customers stopped buying from him; he stated that, as a result, he sold heroin only once in the

month of April.  He further testified that the poor quality of the heroin angered him, and that he wanted to quit as a result. He later testified, however, that the period in which Burns refused to buy from him was approximately fifteen days, that Burns then bought an ounce (twenty-eight grams) from him in order to test the quality, and that he did not recall when that purchase had taken place.

Like Burns, Equihua-Ramirez did not concretely or consistently testify as to the number of transactions or their amount, and no clearer pattern of sales emerges from his testimony than from Burns's.

## C.  *The District Court's Ruling and Order*

The jury found Navarrette and Guzman-Arias guilty of the Conspiracy, Distribution of Heroin, and Possession charges, but did not find true that the distribution of heroin resulted in the death of another.  The jury, however, found true that Navarrette conspired to distribute a kilogram or more of heroin.  After the verdict, Guzman-Arias renewed his motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, arguing that the evidence was insufficient as a matter of law to establish that the conspiracy involved a quantity of at least one kilogram of heroin; Navarrette joined in the motion, which the court denied in a written order.

The court first summarized the evidence discussed above. Noting that the testimony of both Burns and Equihua-Ramirez was vague and failed to specify the total quantity of heroin that either purchased, and applying the substantial evidence standard from *United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc), the court employed two

different approaches to determine the amount of heroin that the jury could have found without speculation.

First, the court analyzed the amount of heroin the jury could have inferred from Equihua-Ramirez's testimony as to the number of purchases he made from Navarrette through Guzman-Arias. Construing the evidence in the light most favorable to the prosecution, *id.* at 1161, the court concluded that the jury could have found that Equihua-Ramirez purchased heroin fourteen times, and that the last purchase was for 100 grams.[3] Adding the 274 grams that both defendants conceded were attributable to the conspiracy (the 75 grams found in the two searches of Equihua-Ramirez's property, and the 199 grams found in Guzman-Arias's car), the court reached a total of 374 grams. However, the court concluded that for the remaining thirteen purchases, the jury could only speculate as to how many times Equihua-Ramirez purchased one, two, or three ounces. Therefore, the court concluded that the only amount that the jury could have found without engaging in speculation was the least of these, as it was certain that Equihua-Ramirez purchased at least one ounce in each of the thirteen transactions. Thus, taking Equihua-Ramirez's testimony and physical evidence alone, the court concluded that the jury could have found beyond a reasonable doubt that the conspiracy involved 699 grams of

---

[3] It is unclear whether the district court meant pieces (25 grams) or ounces; four ounces would be 112 grams, whereas four pieces would be 100.

heroin (274 grams found, plus 100 grams admitted as the last purchase, plus 325 grams).[4]

Next, the court analyzed Burns's testimony to determine the quantity of heroin that the jury could have inferred without speculation. Noting again the inconsistencies in Burns's testimony with regard to the frequency with which he purchased heroin, the court turned to the phone records showing calls between Equihua-Ramirez and Burns in order to estimate the number of transactions between them. While the court arrived at a number of transactions it believed was adequately supported by the phone records and testimony, the court observed that, again, the jury would have had to speculate as to how much heroin was involved in each. Nonetheless, the court concluded that the jury could have found without speculation that Burns purchased 750 grams from Equihua-Ramirez, based on Burns's testimony that he purchased "a few," or three pieces (75 grams) per week, and based on the assumption of a ten-week period.

Thus, the court found that the physical and testimonial evidence did not reach the one kilogram quantity threshold. The court concluded, however, that Equihua-Ramirez's and Burns's testimony provided the jury

> a reasonable 'guide' as to the total amount
> that was involved in the conspiracy. Based on
> the history of dealing from mid-March to

---

[4] It is again unclear whether the court meant "pieces" or ounces in coming to the total of 325 grams; 28 grams per ounce multiplied 13 times is actually 364 grams, which would bring the total to 750 grams – 274 grams found, plus 112 grams (four ounces) for the last purchase, plus 13 purchases totaling 364 grams.

> early June 2012 . . . and construing the
> evidence and inferences in the Government's
> favor, the jury could have made a reasonable,
> non-speculative inference that Defendants
> must have agreed to distribute as much heroin
> as they could and that the distribution would
> have continued in a similar fashion.

That is, the court concluded that the evidence in the record established a pattern of transactions that would have allowed the jury to infer a preexisting agreement to distribute at least a kilogram of heroin.

Count One carried a mandatory minimum of twenty years, due to Navarrette's prior conviction and the jury's special finding. Count Two carried no mandatory minimum, and Count Four carried a mandatory minimum of ten years. On the basis of the jury's quantity finding, as well as an increase of three levels for Navarrette's role in the conspiracy, and after subtracting two levels for an anticipated change in the U.S. Sentencing Guidelines, the court calculated a base offense level of thirty-three. After considering Navarrette's criminal history, the court calculated the guideline range for each count as 168–210 months, before taking into account the mandatory minimum on Count One. The court then sentenced Navarrette to 240 months on each count of conviction (the mandatory minimum on Count One due to the the one kilogram quantity), to run concurrently, and to a 10-year term of supervised release following his incarceration. The court used the same base offense level in imposing the sentences on each count.

## II.

*A. Standard of Review and Jurisdiction*

Both with respect to his sentence and his conviction, Navarrette appeals a final judgment of a district court, and thus we have jurisdiction under 28 U.S.C. § 1291.

Navarrette first challenges the jury's quantity finding for the conspiracy to distribute and distribution charges. He does not raise an evidence insufficiency challenge to the jury's verdict with respect to his convictions for any of the substantive offenses. After *Apprendi v. New Jersey*, 530 U.S. 466 (2000), "[w]e . . . trea[t] drug quantity and type, which fix the maximum sentence for a conviction, as we would any other material fact in a criminal prosecution: it must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt." *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002); *see also United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014). The jury's quantity finding subjected Navarrette to a twenty-year mandatory minimum sentence, as he had previously been convicted of a drug felony, 21 U.S.C. § 841(b)(1)(A)(i); setting aside this finding would mean that he is no longer subject to that mandatory minimum. Thus, the jury had to find the one kilogram quantity beyond a reasonable doubt.

We review a jury's verdict and special findings for substantial evidence, which requires that we first "construe the evidence 'in the light most favorable to the prosecution,' and only then determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1161 (quoting *Jackson*, 443 U.S. at 319). This means that "when faced with

a record of historical facts that supports conflicting inferences [we] must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 1164 (internal quotation marks omitted). However, "[a]lthough we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than . . . mere speculation dressed up in the guise of evidence." *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005).

Second, Navarrette challenges the district court's admission of evidence of his prior convictions as impeachment evidence following the testimony of his sister, Mini Navarrette. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999).

## B. *Conspiracy Generally*

"To establish a drug conspiracy, the government must prove: 1) an agreement to accomplish an illegal objective; and 2) the intent to commit the underlying offense." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (quoting *United States v. Barragan*, 263 F.3d 919, 922 (9th Cir. 2001)). The government "can prove the existence of a conspiracy through circumstantial evidence that defendants acted together in pursuit of a common illegal goal." *United States v. Bishop*, 1 F.3d 910, 911 (9th Cir. 1993) (citation omitted). "Express agreement is not required; rather, agreement may be inferred from conduct." *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992) (citation omitted). Thus, evidence of past transactions can constitute circumstantial evidence of a preexisting agreement, because

it can be inferred that the defendants agreed to carry out those transactions.

Circumstantial evidence of a drug distribution conspiracy is not limited to evidence of past completed transactions. *See, e.g.*, *United States v. Rosales*, 516 F.3d 749, 755 (9th Cir. 2008) (considering evidence of a hydraulic press and metal molds that could be used to produce kilogram bricks of cocaine in determining that sufficient evidence supported a conviction of conspiracy to distribute at least 500 grams of cocaine). Moreover, a conspiracy conviction does not require "the delivery, presence, or even existence of actual contraband." *United States v. Macias-Valencia*, 510 F.3d 1012, 1016 (9th Cir. 2007). But in order for the defendant to be subject to a mandatory minimum under § 841(b)(1)(A)(i), the government still must prove, beyond a reasonable doubt, that an agreement to distribute one kilogram existed before the expiration of the period alleged in the indictment. As we explain below, the government failed to meet its burden of proof.

## C. Physical and Testimonial Evidence Presented

Before examining whether the circumstantial evidence of the defendants' pattern of transactions can support the one kilogram quantity finding, we first consider whether the government otherwise presented sufficient evidence to establish that amount.

The government contends that the district court's finding of 750 grams, inferred from Burns's testimony, plus the 274 grams conceded by Navarrette, exceeds one kilogram, and thus the jury's finding is supported by substantial evidence. Navarrette, in turn, argues that even if the district court failed

to add all of the 274 grams of physical evidence in reaching the 750 gram estimate, "it is fair to assume that [the district court] counted at least the 62 grams seized from Equihua-Ramirez, as this amount was earmarked for Burns." Even adding the remaining 212 grams to the 750 grams inferred from Burns's testimony, the quantity still falls short of one kilogram. Navarrette further argues that the district court erred when it determined that the conspiracy continued for ten weeks, because it was "undisputed that the heroin went 'bad' for a while during which time Burns purchased heroin from Equihua-Ramirez only once," and, moreover, "Equihua-Ramirez testified that this was a substantial period during April and May."

While it is true that Equihua-Ramirez testified at one point that the period during which the heroin went bad lasted most of April, at another point during the trial, he testified that it lasted approximately fifteen days. Burns likewise testified that he did not purchase heroin from Equihua-Ramirez for a period, although he did not testify how long that lasted. Because we must resolve all conflicting evidence in favor of the prosecution, we will use the lower of Equihua-Ramirez's estimates (that is, fifteen days), and conclude that the period in which Equihua-Ramirez and Burns conducted their transactions spanned eight weeks, not ten (ten weeks minus fifteen days). Using the district court's 75 gram per week calculation (from Burns's testimony that he purchased "a few" each week) the total would thus come to 600 grams. Even adding 75 grams for the single instance in which Burns purchased three pieces, and all of the 274 grams that Navarrette conceded, the total amount of heroin established would come to 949 grams. There was no evidence presented that Equihua-Ramirez's additional gram-level customers would make up the difference.

Turning to Equihua-Ramirez's testimony, even if we attempted to determine the quantity of heroin from his testimony regarding his sales to Burns (instead of the 699 grams based on the number of Equihua-Ramirez's purchases), it still would not reach a kilogram. Equihua-Ramirez testified that Burns bought "sometimes two, sometimes three" pieces a week from him (fifty or seventy-five grams), but also testified that Burns stopped buying from him for a period. Equihua-Ramirez also testified repeatedly that he only sold Burns three pieces on one single occasion. Thus, a relatively liberal calculation based on his sales to Burns, as well as his admitted four-ounce buy (which risks double-counting, since some of that could have been sold to Burns) and the 200 grams found on Guzman-Arias (his last order) would still not total a kilogram: 50 grams multiplied by 8 weeks (two pieces per week, and not counting the period the heroin went bad) plus 75 grams (the single three piece buy) plus 112 grams (the four ounce order) plus 200 grams (the final controlled buy) totals 787 grams.

The district court did not attempt to determine an average amount of heroin distributed either from Burns's testimony or from Equihua-Ramirez's testimony, instead relying on the least amount that either defendant testified was his minimum sale or purchase. We have previously approved the "multiplier method," for approximating drug quantity "by determining a daily or weekly quantity, selecting a time period over which it is more likely than not that the defendant was dealing in that quantity and multiplying these two factors together," *United States v. Culps*, 300 F.3d 1069, 1077 (9th Cir. 2002). However, we have done so only in the sentencing context, in which the government was required to prove quantity by a preponderance of the evidence for sentencing purposes, and not, as here, where the factual issue had to be

proved beyond a reasonable doubt.   Under the *Jackson* standard, we are obliged to construe the evidence of drug quantity adduced at trial "in the light most favorable to the prosecution," and only after viewing the evidence in this light, determine whether, resolving all conflicting inferences in favor of the prosecution, "*any* rational trier of fact could have found" the one kilogram quantity "beyond a reasonable doubt." 443 U.S. at 319.  *Jackson v. Virginia*, 443 U.S. at 319.  Applying the *Jackson* standard, we conclude that the district court did not err in declining to apply the multiplier method given the facts of this case.

We further conclude that the district court did not err in disregarding the circumstantial evidence of the secret storage compartment in Navarrette's vehicle, capable of holding 30 pounds of drugs.  The government offered no evidence that the storage compartment was used to transport heroin, as opposed to any other kind of contraband, or that Navarrette ever used the compartment.   We also note that the drug-sniffing dog did not alert to the compartment during the search.[5]

Therefore, as did the district court, we conclude that the testimonial and physical evidence cannot support a finding of one kilogram.

---

[5] While we have stated that a defendant's mere access to equipment capable of producing a kilogram of cocaine "supports the jury's verdict that it was reasonably foreseeable that the conspiracy involved 500 grams or more of cocaine," *Rosales*, 516 F.3d at 755, the government did not raise this argument on appeal, and therefore we do not address it here. "Our circuit has repeatedly admonished that we cannot manufacture arguments for an appellant."  *Ind. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1082 (9th Cir. 2001)).

## D. *The Pattern of Heroin Transactions*

We turn to the district court's conclusion that the defendants' pattern of transactions constituted circumstantial evidence, such that "the jury could have made a reasonable, non-speculative inference that Defendants must have agreed to distribute as much heroin as they could and that the distribution would have continued in a similar fashion."

Even if some hypothetical pattern of transactions were consistent and clear enough to infer a preexisting agreement to surpass a certain quantity, such is not the pattern before us. While the testimony of Equihua-Ramirez and Burns could prove repeated transactions over a period of eight weeks, the testimony did not show any consistency in those transactions, either with respect to amount or to frequency, from which a jury could reasonably infer an agreement to distribute a kilogram of heroin. This conclusion is underscored by the vague and equivocal nature of the testimony itself. Both witnesses at points contradicted themselves, and Burns repeatedly indicated that his memory was unreliable.

Even construing the evidence in the light most favorable to the prosecution, the purchases in this case appear to have been ad hoc, and dependent on the level of demand at any given moment. The evidence showed that Equihua-Ramirez bought his supply of heroin from Navarrette only once he had sold the amount he had previously purchased; that Burns was Equihua-Ramirez's biggest customer; that Burns only purchased heroin when there was sufficient demand; that demand was "different all the time"; and that there was a period of approximately two weeks out of a total period of ten weeks in which the heroin "went bad," and Burns did not purchase any heroin.

Moreover, the testimony given at trial revealed that the whole arrangement was temporary and unstable. During the period alleged in the indictment, Equihua-Ramirez was effectively subbing for his friend. He testified that he had no intention of continuing once his friend returned, and, in fact, that he became so frustrated with the bad heroin that he considered quitting. Similarly, Burns repeatedly testified that he intended to quit selling heroin. In sum, it would be speculative to infer that the defendants agreed to *any* future transactions such that they would reach the one kilogram mark. Speculation cannot constitute substantial evidence. *See Juan H.*, 408 F.3d at 1277.

Our conclusion is further supported by the Fourth Circuit's holding in *United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010). In that case, the court held that substantial evidence did not support a conviction for conspiracy to distribute one kilogram of heroin where the past transactions and future, expressly agreed-upon transactions amounted to a maximum of 836 grams. *Id.* at 766. In *Hickman*, as in this case, the government argued that the jury could conclude that the transactions proven were part of an "ongoing course of business." *Id.* at 768. The government in that case further argued that "[it was] clear that . . . [the defendant] would have continued" to distribute heroin. *Id.* The *Hickman* court disagreed. It concluded that such a finding would come perilously close to impermissibly convicting the defendant of "hypothesized future bad acts," and, moreover, that "[w]here no evidence exists to guide the trier of fact in determining the outer scope of a conspiracy, the trier may not simply guess at the magnitude or frequency of unknown criminal activity." *Id*. at 768–69.

In this case, the district court attempted to distinguish *Hickman*. In *Hickman*, the defendants agreed to or actually undertook three transactions, whereas in this case the number is at least ten. Therefore, the district court concluded that, unlike in *Hickman*, here there was sufficient evidence to "guide" the jury "as to the total amount that was involved in the conspiracy," because there were "multiple purchases and multiple sales and thus, there were more than a 'limited number of actual transactions.'" But though the evidence here showed more transactions than in *Hickman*, *Hickman* is not so easily distinguishable. In *Hickman*, the evidence supported a finding that the defendants had distributed a maximum of 836 grams over a period of four months, which is not much different than the up to 750 grams over a period of three months (according to the district court's calculations) in this case. And here, like in *Hickman*, the argument that the co-conspirators would have distributed one kilogram if it had not been interrupted potentially allows a quantity finding to stand upon what Navarrette "would have continued to do[,] which, to the extent these hypothesized future bad acts were not captured by an agreement within the charged period, is clearly improper." *Hickman*, 626 F.3d at 768 (internal quotation marks omitted). Such a theory impermissibly "invites the jury to speculate as to the amount of heroin involved in the conspiracy." *Id.*

The government agrees that, should we conclude that substantial evidence does not support the jury's verdict on the one kilogram quantity special finding, the error was not harmless and re-sentencing would be appropriate. While the special finding only resulted in a mandatory minimum sentence on Count One, the district court imposed an identical sentence on all counts. It is clear that the district court used this twenty-year sentence as the "starting point and the initial

benchmark," *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), and that, had the district court sentenced Navarrette absent the special finding and mandatory minimum, "it may have arrived at a different sentence," *see United States v. Munoz-Camarena*, 631 F.3d 1028, 1031 (9th Cir. 2011). Therefore, we reverse the jury's quantity finding, vacate Navarrette's sentence on all counts, and remand for re-sentencing.[6]

## III.

Navarrette challenges his conspiracy and substantive count convictions on the ground that the district court abused its discretion when it permitted the government to ask his sister, defense witness Mini Navarrette, about his prior Washington state convictions for drug trafficking and escape.

The district court had originally granted a pre-trial motion in limine to exclude these convictions as overly prejudicial. However, on cross examination, Mini Navarrette stated that her brother could not drive because he did not have a license, and that "[she knew] that [her] brother did not do any drugs or anything." The government argued that she had opened the door to impeachment, because she knew that Navarrette

---

[6] Because Navarrette's evidence insufficiency claim is limited to the jury's quantity finding, we vacate his sentence, but we do not reverse the underlying conspiracy conviction under 21 U.S.C. § 841(a). As we have explained, "[t]he tainted drug quantity verdict does not affect the validity of the underlying conspiracy conviction because drug quantity was not an element of the charged conspiracy offense; rather, it . . . had to be submitted to a jury and proved beyond a reasonable doubt for the purposes of sentencing alone." *United States v. Vera*, 770 F.3d 1232, 1249 (9th Cir. 2014).

could not drive because he was afraid that he would be pulled over and the outstanding warrant stemming from his escape discovered, and because she knew that he previously had been convicted and imprisoned.  Navarrette objected, but the court allowed the government to question Mini Navarrette about her brother's prior convictions.

On cross-examination, a defense witness opens the door to impeachment by the prosecution if she "truly volunteer[s]" the impeachable testimony.  *Id.* at 1134 n.1.  Here, the government directly asked Mini Navarrette why her brother was unable to drive a car.  The record does not support the government's contention that Ms. Navarrette volunteered that her brother never used the car that was in her name and her sister-in-law's name.  But, Ms. Navarrette opened the door to impeachment later in her testimony, when she volunteered that she knew that her brother was not involved in drugs.  Ms. Navarrette knew that her brother had previously been convicted and imprisoned, and had escaped.  While it is possible that she did not know the exact nature of the conviction, the district court did not abuse its discretion in allowing the government to ask her about her brother's prior convictions.

Moreover, even if the district court did abuse its discretion, the error was harmless.  As the government argues, Navarrette's conviction was supported by phone records tying him to Equihua-Ramirez, as well as by Equihua-Ramirez's testimony that Navarrette's voice on a recorded call was the voice of his supplier, "Califas."  Ms. Navarrette's testimony, intended to support the defense

theory that Navarrette had no involvement in the conspiracy, could not have overcome the weight of this evidence. Accordingly, we affirm the district court's evidentiary ruling.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED for re-sentencing.**